# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| AMERICAN CASUALTY COMPANY | ) | |
| OF READING, PENNSYLVANIA and | ) | |
| CNA CLAIMPLUS, INC., | ) | |
| | ) | |
|     Plaintiffs, | ) | Case No. 3:13-cv-0098 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| CRESENT ENTERPRISES, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the plaintiffs, American Casualty Company of Reading, Pennsylvania ("American") and CNA ClaimPlus, Inc. ("ClaimPlus") (together, "plaintiffs") (Docket No. 43), to which the defendant, Cresent Enterprises, Inc. ("Cresent"), has filed a Response in opposition (Docket No. 61), and the plaintiffs have filed a Reply (Docket No. 75). Also pending is the defendant's Motion to Strike the Affidavit of Cynthia Goral (Docket No. 59), which the plaintiffs have opposed (Docket No. 76). For the reasons stated herein, the defendant's Motion to Strike will be denied and the plaintiffs' Motion for Summary Judgment will be granted.

## FACTUAL BACKGROUND[1]

This action involves an insurance company and its affiliated claims adjuster (the plaintiffs) alleging non-payment by an insured (the defendant). The plaintiffs' claims and

---

[1] Unless otherwise noted, the facts are drawn from the plaintiffs' Statement of Undisputed Facts (Docket No. 45) and the defendant's responses thereto (Docket No. 62), the defendant's Statement of Disputed Facts (Docket 63) and the plaintiffs' responses thereto (Docket No. 77), and the exhibits submitted in support of the parties' briefs (Docket Nos. 46-47, 64-67, 78-80).

defendant's counter-claim are based upon alleged breaches of the same set of agreements—specifically, agreements providing for payment by the defendant in exchange for workers' compensation insurance coverage provided by American and the administration of claims by ClaimPlus.

In short, it appears that the parties maintained a positive relationship until Cresent's insurance policies "converted" in accordance with their terms. The conversion, which is described herein, led to higher financial obligations for Cresent and, unsurprisingly, Cresent's dissatisfaction.

## I. **The 2002 Policy**

Plaintiff American, an insurance company, issued a policy of workers' compensation and employer's liability insurance to Cresent, a furniture manufacturer, for the effective dates of October 1, 2002 through October 1, 2003 ("2002 Policy"). (Docket No. 46, Ex. 1.) In conjunction with the 2002 Policy, American and Cresent entered into a Finance Agreement ("2002 Finance Agreement"), which provided that Cresent would pay premiums, as well as other expenses and costs associated with claims covered by the 2002 Policy. (*Id.*, Ex. 2.)

At the same time, in connection with the 2002 Policy, RSKCo Servs., Inc. ("RSK"), a claims adjuster of insurance claims and predecessor-in-interest to ClaimPlus, entered into a Claim Service Agreement with Cresent ("2002 Claim Service Agreement"). (*Id.*, Ex. 3.) The 2002 Policy, the 2002 Finance Agreement, and the 2002 Claim Service Agreement form the entirety of a workers' compensation insurance program ("2002 Program") negotiated and executed by American, ClaimPlus (through its predecessor-in-interest), and Cresent. The terms of the 2002 Program were further described in a letter sent by American and ClaimPlus to Cresent ("the 2002 Confirmation Letter"). (*Id.*, Ex. 4.)

## II.    2003 and 2004 Renewal

American renewed the 2002 Policy twice, for the effective dates October 1, 2003-October 1, 2004 (the "2003 Policy") and October 1, 2004-October 1, 2005 (the "2004 Policy").  In conjunction with both the 2003 and 2004 Policies, American and Cresent executed Finance Agreements, and ClaimPlus and Cresent entered into Claim Service Agreements.  American sent letters detailing the terms of its insurance programs (the "2003 Program" and "2004 Program") (together, with the "2002 Program", the "Programs") for the 2003 Policy and 2004 Policy (the "2003 Confirmation Letter" and "2004 Confirmation Letter").

## III.    Cresent's Obligations under the Programs

Pursuant to the terms of the Programs, Cresent was obligated to reimburse American and ClaimPlus for expenses associated with claims submitted for coverage, including "paid losses, expenses, claims handling fees, taxes, surcharges and interest."  Pursuant to the Programs, Cresent is responsible for the first $250,000 of each claim submitted for coverage.  Cresent is also obligated to pay claims handling fees to ClaimPlus for a percentage of the losses and expenses associated with the claims submitted for coverage under the Programs.  Moreover, Cresent is required under the Programs to provide collateral for the benefit of the plaintiffs to secure Cresent's obligations.  The Programs further provide for periodic calculation and adjustments of the collateral obligations owed by Cresent.

The Programs state that, if Cresent fails to timely pay an amount owed, the plaintiffs are entitled to interest on past due amounts at a specific commercial paper rate.  The Programs further provide that the plaintiffs are entitled to reimbursement for attorney's fees, expenses, and litigation costs necessary to collect past due amounts.

### A.  Conversion to Incurred Loss Basis

The Programs provide that the policies will convert from a "paid loss" basis to an "incurred loss" basis 42 months (about three and one-half years) after the effective date of each of the policies. It appears from the record that the conversion of the policies caused the financial obligations of Cresent to increase significantly.

The conversion of the policies, which began to affect Cresent's invoices around 2008, sparked the parties' current dispute and this litigation. After the conversion of the policies, the Programs provide for annual calculations of the amounts owed by the defendant to the plaintiffs for the reimbursement of (1) incurred losses, (2) expenses, (3) taxes, (4) surcharges, and (5) claims handling fees (the annual "Billing Evaluations"). The calculation of "incurred losses," rather than "paid losses," means that, after conversion, the annual amounts owed by Cresent include money set aside in reserve for claims to be paid in the upcoming year, which could reach an amount as high as $50,000 per claim. The Claim Service Agreements executed by ClaimPlus and Cresent provide that ClaimPlus is entitled to set loss reserves for reserve claims, but that ClaimPlus must notify Cresent when any claim reserve amount changes by more than $50,000.00. (Docket No. 46, Exs. 3, 7, 11.)

The Programs further provide that the annual invoice calculations for Billing Evaluations are performed with losses valued as of the first day of April and continue yearly, until all claims submitted for coverage under the Programs are closed. Upon calculation, the plaintiffs perform an incurred loss adjustment, at which time Cresent may be billed for additional premium, or premium could be returned to the insured based on the prior year's reserve amounts, current claims, and outstanding reserve amounts. The "incurred amount" is intended to be used as collateral for claim dollars that will be paid over the upcoming year. (Docket No. 67, Ex. B.)

IV.     **ClaimPlus's Obligations under the Claim Service Agreements**

In exchange for payment, the Claim Service Agreements executed by ClaimPlus and Cresent include a variety of responsibilities on the part of ClaimPlus, including:

- ClaimPlus will undertake to perform services under this Agreement with reasonable dispatch, diligence and care . . . .

- ClaimPlus will provide or cause an invoice and appropriate supporting documentation to be provided to Client for the fees and expenses ClaimPlus incurred under this Agreement during that invoice period . . . .

- ClaimPlus will provide or cause Client to be provided with a reimbursement statement ("Statement") for:

  - Claims payments and Allocated Loss Adjustment Expenses paid during the Statement period;
  - Claim Services Fees earned during the Statement period; and
  - Such funding arrangement as mutually agreed to between Client and ClaimPlus or its agent.

  . . .

- Upon receiving reasonable notice and during ClaimPlus's normal business hours, ClaimPlus will permit authorized employees of Client, authorized employees of Clients [sic] broker, and any other representative of Client who has entered into a confidentiality agreement or other agreement which ClaimPlus believes is required by law with ClaimPlus to:

  - Audit ClaimPlus's records as they pertain to Claims administered under this Agreement; and
  - Review ClaimPlus's operations in order to evaluate the quality and accuracy of ClaimPlus's employees and operations as they relate to Client's Claims.

(Docket No. 46, Exs. 3, 7, 11.) The Claim Service Agreements further list administrative services to be performed by ClaimPlus, including the obligations to:

- Accept and acknowledge proof of loss;

- Establish and maintain claim files for each Claim transferred to or first reported to ClaimPlus;

- Reopen Claims or handle post-closing activities as necessary;

- Investigate all Claims to the extent reasonable and customary to evaluate the merits of such Claim;

- Set loss reserves;

- Retain attorneys, as determined by carrier, to provide assistance in administering or defending Claims subject to this Agreement;

- Investigate, adjust, settle or resist all Claims within the Discretionary Settlement Authority Limit of ClaimPlus.

(*Id.*)  The Claim Service Agreements further state that ClaimPlus must consult with Cresent "when any Claim reserve changes by more than $50,000" and provide Cresent with "quarterly written status reports, if requested, for any open Claim with an incurred amount of $50,000." (*Id.*)

## V.  Relationship among the Parties

Dennis Condra, the President and CEO of Cresent, states in an affidavit that the workers' compensation insurance relationship between Cresent and the plaintiffs began around October 1, 1990.  According to Condra, in 2005, Cresent ceased its domestic manufacturing and, on October 1, 2005, American canceled Cresent's insurance policy, effective January 1, 2006.  (Docket No. 64 ¶ 9.)  After the final policy was canceled, the plaintiffs continued to bill Cresent for expenses related to claims under the Programs, and Cresent received, reviewed, and paid the invoices.  (*Id.* ¶ 12.)

## VI.  Specific Invoices at Issue

The plaintiffs have alleged that the defendant failed to make payment on six invoices, issued over a period of three years, related to the 2002 Program, 2003 Program, and 2004 Program (the "2010-2013 Billing Evaluations").  The six invoices pertain to three annual periods: (1) the billing period April 1, 2010-April 1, 2011 ("2011 Billing Evaluations"); (2) the

billing period April 1, 2011-April 1, 2012 ("2012 Billing Evaluations"); and (3) the billing

period April 1, 2012-April 1, 2013 ("2013 Billing Evaluations"). Specifically, the plaintiffs

allege the following amounts owed by the defendant:

- For the billing period April 1, 2010 to April 1, 2011:

  - $35,304 related to claims covered by the 2002 Program;

  - $196.00 related to claims covered by the 2003 Program;

  - $48,356 related to claims covered by the 2004 Program;

- For the billing period April 1, 2011 to April 1, 2012:

  - $1,867.00 related to claims covered by the 2002 Program;

  - $68.00 related to claims covered by the 2003 Program;

  - $4,312.00 related to claims covered by the 2004 Program;

- For the billing period April 1, 2012-April 1, 2013:[2]

  - $8,976.00 related to claims covered by the 2002 Program;

  - $175.00 related to claims covered by the 2003 Program;

  - $2,945 related to claims covered by the 2004 Program.

The plaintiffs further aver that the defendant is currently indebted to the plaintiffs for the sum of

the outstanding invoices, equal to $84,247.00, as well as interest.

It is undisputed that, after it received the 2011 Billing Evaluations, Cresent informed the

plaintiffs that it was disputing the charges and requested supporting documentation for the

---

[2] The court notes that the parties appear to have mistakenly misidentified the relevant billing periods in at least two paragraphs of the plaintiffs' Statement of Undisputed Facts and the defendant's responses thereto. (Docket No. 62 ¶¶ 30-31 (inaccurately listing invoice periods as "April 1, 2001 to April 1, 2012" and "April 1, 2012 to April 1, 2014"). For purposes of this memorandum, the court considers the relevant invoices to include April 1, 2010-April 1, 2011; April 1, 2011-April 1, 2012; and April 1, 2012-April 1, 2013, as identified by the parties' briefs.

charges. It is further undisputed that Cresent's insurance agent, Jodie Folk, advised Cresent "not to accept" the invoices presented by the plaintiffs. Cresent also appears to have disputed the 2012 and 2013 Billing Evaluations upon receipt.

On November 5, 2012, the plaintiffs' legal counsel sent a demand to Cresent for an outstanding balance of $90,103.00. A week later, on December 12, 2012, Condra asked the plaintiffs' counsel for an invoice explaining the charges. The plaintiffs' counsel provided copies of the Billing Evaluations for 2011 and 2012, as well as access to an online system containing information about claims listed on the invoices.

## VII.  e-Sight Program

It is undisputed that the plaintiffs use an access system called "e-Sight" to permit some of their clients to review claim files electronically.[3] According to the plaintiffs, e-Sight provides the insured with claim details, including adjuster notes, financial transactions, and claim activities, as well as a choice of reports and features to allow an insured to analyze its claim date. The parties agree that Cresent received information to access e-Sight in December 2012, upon its request for further information regarding the 2011 and 2012 Billing Evaluations. The parties

---

[3] The court notes that the defendant appears to have misunderstood Rule 56 and Local Rule 56.01's provisions setting forth that a party should respond to its adverse party's statement of facts by "disputing" or "admitting" certain facts. Here, the defendant has "disputed" facts submitted by the plaintiffs that are, in reality, undisputed. For example, the plaintiffs submit as an undisputed fact: "Plaintiffs' [sic] use an access system referred to as e-Sight to permit an insured to electronically review its claim files." The defendant responded, "It is disputed that the Defendant had any knowledge of or access to this system. . . . Cresent received information to gain access to e-Sight from CAN for the first time on December 5, 2012; however, they encountered problems and could not enter the system on that date." (Docket No. 62 ¶ 35.) Here, the defendant is not disputing the fact as submitted by the plaintiffs. It does not write that the plaintiffs do *not* use the e-Sight system; rather, the defendant appears to agree that the plaintiffs use the e-Sight system.

appear to agree that Cresent's access to e-Sight was terminated around February 2013, around the time that the plaintiffs filed this action.

## VIII.  <u>Procedural Background</u>

The plaintiffs filed this action on February 7, 2013.  (Docket No. 1.)  On April 23, 2013, the plaintiffs filed an Amended Complaint with leave of court.  (Docket No. 16.)  The Amended Complaint alleges claims related to non-payment of the 2010-2013 Billing Evaluations, including breach of contract, unjust enrichment, and a claim for account stated.  The Amended Complaint seeks compensatory damages in the amount of $84,247.00, as well as pre-judgment and post-judgment interest, attorney's fees, and discretionary costs.

On May 10, 2013, the defendant answered the Amended Complaint and filed a counter-claim against the plaintiffs, alleging breach of contract as to the administration of the Programs.  (Docket No. 18.)  The defendant alleges that the plaintiffs breached obligations under the Programs to exercise reasonable diligence and care in the investigation of the merits of workers' compensation claims, as well as the administration of the Programs.  (*Id.*)  The plaintiffs answered the defendant's Counter-Complaint on May 31, 2013.  (Docket No. 19).

The pending motion for summary judgment was filed on January 17, 2014.  (Docket No. 43.)

## <u>ANALYSIS</u>

## I.  <u>Defendant's Motion to Strike</u>

### A.  Generally

The defendant has filed a Motion to Strike the Affidavit of Cynthia Goral, which was submitted by the plaintiffs in support of their Motion for Summary Judgment.  (Docket No. 59 (Motion to Strike); Docket No. 46 (Goral Aff.).)  As an initial matter, a motion to strike is not a

proper procedural method by which to defeat supporting documents which one party finds objectionable. *See, e.g.*, *Foshee v. Forethought Federal Savings Bank*, No. 09-2674, 2010 WL 2158454, at *2 (W.D. Tenn. May 7, 2010); Wright & Miller, 5C *Federal Practice and Procedure* § 1380 (3rd ed.). Federal Rule of Civil Procedure 12(f) authorizes a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). However, as other district courts have pointed out, "[a]ffidavits and/or attached exhibits accompanying memoranda in support of motions for summary judgment, or the memoranda themselves for that matter . . . are not among the documents identified as 'pleadings' by the Federal Rules." *Foshee*, 2020 WL 2158454, at *2. Consequently, Cresent's Motion to Strike is not a proper procedural device for the plaintiffs' objections to the Goral Affidavit.

Instead of striking evidence from the record, courts should simply disregard inadmissible evidence. *Lombard v. MCI Telecom. Corp.*, 13 F. Supp. 621, 625 (N.D. Ohio 1998) (citing *Dawson v. City of Kent*, 682 F. Supp. 920 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988)); *see State Mut. Life Assur. Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Accordingly, the court will deny the defendant's Motion to Strike, but will consider whether it should *disregard* the Goral Affidavit because it does not meet the requirements of Fed. R. Civ. P. 56(c).

**B.  Cresent's Objections to the Goral Affidavit**

The defendant urges the court to disregard the Goral Affidavit because it does not satisfy the requirements set forth by Fed. R. Civ. P. 56(c). Rule 56(c)(4) requires that an affidavit used to support or oppose a summary judgment motion must (1) be made on personal knowledge; (2)

set out facts that would be admissible in evidence; and (3) show that the affiant or declarant is competent to testify on the matters stated.

Cresent argues that the affidavit does not demonstrate that it is made on personal knowledge and does not demonstrate Goral's competency to testify about the matters addressed in her affidavit. Indeed, the first Goral Affidavit, filed in support of the plaintiffs' Motion for Summary Judgment (Docket No. 46 ("First Goral Aff."), fails to identify or state (1) Goral's relationship to the plaintiffs so as to demonstrate personal knowledge and (2) Goral's competency to testify on the matters stated.

However, in response to the defendant's Motion to Strike, the plaintiffs filed a second Goral Affidavit. (Docket No. 78 ("Second Goral Aff.").) The Second Goral Affidavit remedies the deficiencies of the First Goral Affidavit. It states:

1. My name is Cynthia Goral. . . . I am fully competent and qualified in all respects to make this Affidavit.
   . . .
2. I am a Legal Specialist in the Legal Collections Department of CNA Insurance Companies. Plaintiffs are companies operating under the CNA trademark. I have been employed by CNA Insurance Companies in the Legal Collections Department for approximately 14 years. I am not an attorney. In my capacity as Legal Specialist, I am responsible for the collection of debts owed by insureds to Plaintiffs for which Plaintiffs are forced to institute litigation. The facts set forth in this affidavit, as well as in my January 2014 affidavit [the First Goral Aff.], are based upon my personal knowledge and on my review of documents maintained in the ordinary course of business for Plaintiffs.

(*Id.*)

An affiant's "personal knowledge" may be based on his or her observations and experiences. *Bacon v. Honda of Am. Mfg.*, 192 F. App'x 337, 346 n.9 (6th Cir. 1999). Here, the court concludes that Second Goral Affidavit sufficiently demonstrates that the testimony offered by Goral in both the First and Second Goral Affidavits is based upon her personal knowledge as

an employee in the Legal Collections Department of the plaintiffs. Moreover, the court notes

that the defendant has not objected to the Second Goral Affidavit and, in particular, Goral's

additional testimony regarding her relationship to the plaintiffs and competency to testify

regarding the information included and attached to her affidavits. Additionally, the defendant

does not cite any persuasive authority indicating that the court should disregard the First Goral

Affidavit or the Second Goral Affidavit.[4]

Finally, the defendant does not identify any prejudice it would suffer as a result of the

court's consideration of the First and Second Goral Affidavits. *See* Fed. R. Civ. P. 61 (stating

"[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding

which does not affect the substantial rights of the parties."). Accordingly, the court will consider

both Goral Affidavits to be admissible for purposes of the pending summary judgment motion.

## II. <u>Plaintiffs' Motion for Summary Judgment</u>

The plaintiffs have moved for summary judgment as to (1) the plaintiffs' claim for breach

of contract against the defendant (Count One of the Amended Complaint), and (2) the

---

[4] The defendant relies on a single Sixth Circuit case, *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005), and appears to suggest that *Brainard* stands for the proposition that the court must disregard the Goral Affidavits. However, in *Brainard*, the Sixth Circuit reviewed the propriety of a district court's consideration of an affidavit written by *outside counsel* to the defendant, as well as certain materials attached to that affidavit. Although the Sixth Circuit concluded that the contents of the outside counsel's affidavit were not based on personal knowledge, the court held that any error in considering the affidavit was harmless because the plaintiffs were not prejudiced by the court's ruling and the attachments to the affidavit contained properly authenticated discovery materials. The circumstances here are distinguishable. The affiant—who is an (internal) employee of the plaintiffs and appears to have been directly involved in the events underlying the plaintiffs' claims—has remedied the deficiency of her initial statement and stated under penalty of perjury that she possesses personal knowledge regarding the contents of her affidavits and the documents attached thereto. Accordingly, *Brainard* does not support the defendant's argument that the court should strike or disregard the Goral Affidavit.

defendant's counterclaim against the plaintiffs for breach of contract. As an initial matter, the court notes that the plaintiffs seek summary judgment as to only the first of their three claims. Therefore, the pending motion is a motion for partial summary judgment and was filed without the court's leave in violation of the court's Initial Case Management Order.[5] Despite this procedural defect, in the interest of expediency, the court will overlook the plaintiffs' error and consider the instant motion.

## A. Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003.) The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.*

Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's

---

[5] The Initial Case Management Order issued by the court on April 15, 2013 requires that a party seek and receive leave of the court before filing a motion for partial summary judgment. (Docket No. 15 ¶ K ("No motion for partial summary judgment shall be filed except upon leave of court. Any party wishing to file such a motion shall first file a separate motion that gives the justification for filing a partial summary judgment motion in terms of overall economy of time and expense for the parties, counsel, and the court.").)

claim. Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**B. Application to Plaintiffs' Breach of Contract Claim**

To succeed on their motion, the plaintiffs must demonstrate an absence of genuine issues of fact as to all essential elements of their breach of contract claim.

1. <u>Overview and Choice of Law</u>

The plaintiffs argue that the defendant's failure to pay the 2010-2013 Billing Evaluations constitutes a breach of the agreements among the parties. The plaintiffs further allege that they are entitled to compensatory damages in the amount of $84,247.00, contractual interest in the amount of $13,503.76, and unspecified attorney's fees and litigation costs.

The parties agree that the agreements among the parties were executed in Tennessee but that the agreements contain a choice of law provision selecting Illinois law as governing the agreements. The parties further agree that the court need not determine the appropriate choice of law for the agreements because the elements for breach of contract are "virtually identical" under both Illinois and Tennessee law.[6] Here, the parties dispute only one element of the breach of contract claim, which they agree is essential under both Illinois and Tennessee law: whether the plaintiffs fully performed their obligations under the Programs.[7]

Cresent's defense to the breach of contract claim is difficult to follow. Cresent alleges that the plaintiffs breached (or failed to perform) their obligations under the contract by failing to perform certain administrative services in accordance with the terms of the Claim Service Agreements. Cresent appears to posit that, although it is undisputed that the plaintiffs provided insurance coverage and administered claims under the Programs, the plaintiffs' alleged failure to perform these administrative obligations excuse Cresent from having to pay the 2010-2013 invoices. Cresent's counterclaim is premised on the same theory. To succeed on their breach of contract claim at this stage, the plaintiffs must demonstrate that no colorable evidence exists in the record to create a triable issue of fact as to whether they performed under the Programs.

---

[6] It is well-settled that, in Tennessee, a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). Under Illinois law, the elements of a breach of contract claim are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007).

[7] It is undisputed that (1) the contracts that constitute the Programs are enforceable; (2) the defendant has failed to remit payment for the 2010-2013 Billing Evaluations; and (3) the plaintiffs have suffered damages as a result of the defendant's non-payment of the 2010-2013 Billing Evaluations.

1.  <u>Whether the Plaintiffs Performed under the Programs</u>

The plaintiffs argue that they performed under the Programs because it is undisputed that they (1) provided the insurance coverage set forth by the Programs and (2) managed and administrated the claims submitted for coverage in accordance with the Programs.  In opposition, the defendant argues that a genuine issue of fact appropriate for trial exists as to the plaintiffs' performance because, as alleged in its counterclaim, the plaintiffs have failed to meet certain additional obligations under the contracts related to investigation and due diligence in the administration of the insurance policies.  In support of its argument, the defendant relies on two affidavits: the Condra Affidavit and an affidavit of Jodie Folk, Cresent's insurance agent.

   a.  *American's Performance under the Programs*

As an initial matter, the defendant appears to lump together the plaintiffs for purposes of its counterclaim.  Because each plaintiff executed separate and unique contracts with Cresent as to the Programs, the court concludes that it is necessary to consider the plaintiffs' respective obligations and performances under the Programs separately.

On its face, the defendant's "Counter-Complaint" fails to identify which specific agreement and provisions of the Programs that it alleges that American and ClaimPlus breached. (Docket No. 18.)  However, in its brief filed in opposition to the plaintiffs' summary judgment motion, the defendant includes an excerpt from the Claim Service Agreements that was executed by only ClaimPlus and Cresent—not American.  (Docket No. 46, Exs. 3, 7, 11.) Problematically, Cresent has failed to identify any agreement or provision of an agreement signed by *American* that obligates *American* to perform the services that Cresent alleges were not performed, such as the investigation of claims, the furnishing of appropriate documentation, or the exercise of diligence in the administration of claims.

16

At this stage, Cresent must demonstrate that each plaintiff (or both plaintiffs) failed to perform under a contract with Cresent.[8]  Because Cresent has pointed only to a contract executed between itself and ClaimPlus, the court concludes that Cresent has not met its burden of demonstrating that a genuine issue of material fact exists as to American's performance under the Program.  Accordingly, American has demonstrated that it is undisputed that (1) a valid and enforceable contract exists between itself and Cresent;[9] (2) American performed under the contract by providing insurance coverage to Cresent for workers' compensation claims; (3) Cresent failed to remit payment to American for the 2010-2013 Billing Evaluations and, in doing so, has breached the contract between the parties; and (4) American suffered damages as a result of the breach.  Therefore, summary judgment is appropriate for American on its breach of contract claim.

b. *ClaimPlus's Performance under the Program*

The plaintiffs submit that, as a matter of law, ClaimPlus performed under the agreements because it met its obligation to administer claims pursuant to the Program.  In opposition, Cresent appears to allege that its "history" with the plaintiffs, particularly a dispute regarding two prior invoices, is sufficient to create a question of fact as to whether ClaimPlus performed under the Programs.  Cresent presents its "history" with ClaimPlus incoherently and appears to rely primarily on a variety of unsubstantiated allegations by Condra as "evidence" of nonperformance.

---

[8] Cresent has not offered any explanation for this defect, such as alleging that American is an *alter ego* of ClaimPlus.

[9] Although not directly addressed by the parties, Cresent does not dispute that the Programs and underlying contracts constitute enforceable contracts.  Indeed, by filing and prosecuting its counterclaim for breach of the Programs, Cresent argues that it is undisputed that the contracts underlying the Programs are enforceable.

i. *The Disputed 2008 and 2009 Billing Evaluations*

It is undisputed that, in 2008 and 2009, Cresent received large invoices from the plaintiffs as to claims submitted for coverage under the 2003 and 2004 Policies, following the policies' conversions (the "2008 and 2009 Billing Evaluations"). Following receipt of these invoices, which in sum totaled over $100,000.00 (primarily because of reserve amounts set aside for upcoming claims), Cresent requested supporting documentation and clarification of the invoices from the plaintiffs. Cresent, upon advice of its agent, Folk, appears to have decided that these invoices constituted "overbilling" and refused to pay the invoices.

Over a two-year period, Cresent and the plaintiffs exchanged communications about the 2008 and 2009 invoices. Despite several communications among the parties, Cresent argues that it remained dissatisfied with amounts listed on the invoices and, apparently, also dissatisfied with the substance of the plaintiffs' communications regarding the invoices. Cresent appears to argue that, because it contested the 2008 and 2009 invoices and because the supporting documentation provided by the plaintiffs did not resolve Cresent's dissatisfaction, the plaintiffs breached the Claim Service Agreements.

In 2010, it is undisputed that the balance of the 2008 and 2009 Billing Evaluations was settled during a conference call between the parties. Cresent submits that the sum of the 2008 and 2009 invoices, which amounted to $131,577.75, was resolved by a cash payment of $14,676.14. Cresent appears to suggest that the settlement as to the 2008 and 2009 invoices is proof of misconduct or breach on the part of the plaintiffs. Cresent contends that the settlement constituted a "revision," which, it argues, must constitute an admission of miscalculation and misconduct on the part of the plaintiffs.

18

Evidence in the record contradicts the defendant's unsupported allegations regarding the settlement of the 2008 and 2009 invoices. In her second affidavit, Goral states that the 2008 and the 2009 invoices were never revised for inaccuracies but, instead, because subsequent Billing Evaluations produced premium "credits" for the defendant (as may happen with incurred loss policy calculations), the parties agreed to resolve the outstanding balance of the 2008 and 2009 invoices with (1) the application of a 2010 Billing Evaluation premium credit, (2) the application of $54,000 of the defendant's collateral held by the plaintiffs, and (3) a small payment (without interest). The plaintiffs' explanation of the circumstances surrounding the 2008 and 2009 invoices is supported by an exhibit attached to the Folk Affidavit and is uncontroverted by any other evidence in the record.[10]

The defendant produces no evidence demonstrating that ClaimPlus failed to perform its obligations related to the 2008 and 2009 invoices. For instance, Cresent has not argued (or submitted evidence to demonstrate) that, *inter alia*, (1) the 2008 and 2009 invoices were miscalculated; (2) ClaimPlus did not perform its administration services as to the 2008 and 2009 invoices with reasonable diligence and care; or (3) ClaimPlus did not permit employees of Cresent to audit records in accordance with the Claim Service Agreements. On the contrary, Cresent (1) admits that the plaintiffs engaged in extensive communications with Cresent regarding documentation of the claims, and (2) (inaccurately) contends that the plaintiffs eventually revised the invoices and accepted payment from Cresent in a lower amount than first stated.

---

[10] Exhibit F of the Folk Affidavit depicts the agreement set forth by the parties related to the 2008 and 2009 Invoices using the credit of the 2010 Billing Evaluation, a small payment, and collateral draw. (Docket Nos. 66-67.)

The defendant appears to rely solely on its conclusory allegations of dissatisfaction with the 2008 and 2009 Billing Evaluations, as well as evidence that its financial liability increased following conversion of the Programs. Such allegations are insufficient to demonstrate a triable issue of fact as to ClaimPlus's performance under the Claim Service Agreement, particularly as it pertains to the 2010-2013 Billing Evaluations.

Finally, the court notes that Folk, Cresent's insurance agent with personal knowledge of the insurance industry and the Programs, does not state in his affidavit that ClaimPlus's communications regarding the 2008 and 2009 Billing Evaluations constituted inappropriate administration of claims. Upon review of the record, it appears that Cresent's dispute of the 2008 and 2009 invoices was grounded in the defendant's confusion regarding the conversion of the policies and Cresent's dissatisfaction with its increased financial obligations. The plain text of the Claim Service Agreements, however, entitles ClaimPlus to set loss reserves up to $50,000 per claim without consultation with Cresent. The defendant's allegations of dissatisfaction with the terms of the agreement long after its execution, without colorable evidence of nonperformance or breach, are insufficient to raise a triable issue of fact.

ii.     *Additional Allegations of Misconduct*

Cresent further argues that a triable issue of fact exists as to ClaimPlus's performance because it has challenged specific claims included in the 2011 and 2012 Billing Evaluations. Cresent's challenges are uncorroborated and, in light of the record, appear to be factually dubious.

For instance, Cresent argues that it has "disputed the charges" of Mark Phillips in the 2011 invoice and Ronald Brown on the 2012 invoice. Cresent explains that "[b]oth these claims were reported to Cresset [sic] as closed, and they did not receive any notice from CNA claim's

[sic] adjusters that the claims were reopened or why." In response to this allegation, the plaintiffs direct the court to the plain and undisputed text of the Billing Evaluations, which indicate that the claims, in fact, remain closed to investigation, but are still processed for coverage purposes. (Docket No. 46, Exs. P-Q.) The defendant does not respond to this evidence, nor does it substantiate its allegations of nonperformance with documentary evidence or testimony indicating that including a closed claim on an invoice constitutes a breach of the Claim Service Agreements.

Cresent asserts that ClaimPlus failed to perform because Cresent "has knowledge that a former employee, Paul Denius, suffered multiple subsequent injuries after leaving Cresent's employment." Cresent appears to argue that, because of its alleged knowledge of subsequent injuries by a claimant, Cresent has demonstrated an issue of fact as to the plaintiffs' failure to investigate claims under the Programs. In response to these allegations, however, the plaintiffs submit the claim adjuster's file related to Denius, which was produced to the defendant during discovery. The file reflects that the plaintiffs investigated the claimant's subsequent injuries and confirmed that any subsequent injuries occurred to a different body part and, therefore, did not create an intervening accident so as to change coverage for the workers' compensation claim. At the summary judgment stage, Cresent must set forth colorable evidence demonstrating that an issue of material fact exists as to whether ClaimPlus failed to investigate claims under the Programs. Despite Cresent's allegations to the contrary, the undisputed evidence in the record demonstrates that ClaimPlus performed its obligations as to the investigation of the Denius claim under the Programs.

Similarly, Cresent fails to produce evidence to demonstrate that ClaimPlus breached its obligations under the Programs as to the claims of Judy Binion and Michael Green. Cresent

alleges that it has no record of an injury suffered by Binion at the time she was employed by Cresent and that it reported the claim as "unknown" to the plaintiffs and requested an investigation. Cresent further argues that, "despite repeated requests, [the plaintiffs] have never confirmed whether an investigation has ever been completed." (Docket No. 70 at 12.) As an initial matter, Cresent fails to provide any evidence demonstrating that any such requests for information were made. Moreover, Cresent's allegations are controverted by documentary evidence in the record—specifically, the claim adjuster's file as to the Binion claim. The file, attached to the Second Goral Affidavit, reflects notes of investigation to support the plaintiffs' conclusion that Binion's workers' compensation claims were compensable under the Programs. Interestingly, the Binion file also includes a note reflecting that a representative of Cresent was consulted by the plaintiffs and agreed that the injury was compensable. (Docket No. 78, Ex. S.) Moreover, although Cresent alleges that the plaintiffs failed to provide "a substantive response or documentation" as to claims filed by Michael Green, Cresent provides no evidence demonstrating that such requests for information were made or rejected by the plaintiffs to substantiate its allegations.

Finally, Cresent appears to argue that there is a genuine issue of material fact regarding whether the plaintiffs "knowingly billed Cresent for services not related to" claims covered under the Programs. (Docket No. 70 at 15.) Despite Cresent's allegations regarding the plaintiffs' bad faith, however, Cresent has failed to provide any evidence demonstrating that (1) the plaintiffs overbilled Cresent in its 2008 and 2009 invoices; (2) the plaintiffs improperly considered claims filed by Denius for subsequent injuries; or (3) Michael Green's injuries were considered not compensable under the policies.

At this stage, in the face of evidence demonstrating the absence of a material disputed fact as to all essential elements of the plaintiffs' claim, Cresent's burden is to produce admissible evidence demonstrating that a material issue of fact exists as to an essential element of the plaintiffs' claim. Cresent has failed to do so. The uncontroverted evidence in the record, submitted by the plaintiffs and the defendant, demonstrates that ClaimPlus provided documentation to Cresent regarding claims, investigated certain claims, and upon request, provided Cresent with access to additional documentation through e-Sight that Cresent was not necessarily entitled to under the Programs. Remarkably, Cresent has failed to produce any documentary or testimonial evidence in an effort to demonstrate that a genuine issue of fact exists as to the appropriateness of services provided by the plaintiffs.

In sum, Cresent relies solely on its dissatisfaction with ClaimPlus's services as grounds for its failure to pay an outstanding bill. Such dissatisfaction is insufficient to demonstrate *breach* on the part of ClaimPlus, particularly given the plain terms of the Claim Service Agreements, which entitle ClaimPlus to set aside as much as $50,000 in reserve per claim without consultation. Accordingly, the court concludes that no genuine issue of material fact exists as to ClaimPlus's performance under the Claim Services Agreement and, therefore, the plaintiffs are entitled to judgment as to their breach of contract claim as a matter of law.

### C. Summary Judgment as to the Defendant's Counterclaim

The plaintiffs' burden as to their motion for summary judgment is different as it applies to dismissal of the defendant's counterclaim. At this stage, as a moving counter-defendant, the plaintiffs must demonstrate that no genuine issue of material fact exists as to at least one essential element of the defendant's counterclaim. Here, the plaintiffs argue that they are entitled

to summary judgment because no question of fact exists as to damages incurred by the defendant as a result of the plaintiffs' alleged breach.

The defendant alleges in its "Counter-Complaint" that, "[a]s a direct and proximate result of the Counter-Defendants' breach of the parties' agreements the Counter-Plaintiffs have sustained damages." The plaintiffs argue that, despite this allegation, the defendant has failed to present any evidence of damages and, accordingly, summary judgment is appropriate for the plaintiffs as to the counterclaim. The court agrees.

First, damages are an essential element of a claim for breach of contract under both Illinois and Tennessee law. (*Id.* at 4.) Nevertheless, the record is entirely devoid of evidence or any mention of damages incurred by the defendant as a result of the plaintiffs' alleged breach. Remarkably, even after the plaintiffs challenged Cresent's failure to produce evidence as to damages, Cresent did not address this deficiency in its response brief. (*See* Docket No. 70.) Even assessing the evidence in the light most favorable to Cresent, it has failed to produce specific facts beyond the pleadings from which a reasonable jury could conclude that it suffered damages as a result of the plaintiffs' alleged breach. Accordingly, summary judgment is appropriate for the plaintiffs as to the defendant's counterclaim for breach of contract.[11]

### CONCLUSION

For these reasons, the defendant's Motion to Strike the Affidavit of Cynthia Goral will be denied and the plaintiffs' Motion for Summary Judgment will be granted. It will further be

---

[11] Because the court concludes that the defendant has failed to demonstrate that a genuine issue of fact exists as to the damages element of its claim, the court need not reach the plaintiffs' additional arguments regarding the necessity of expert witness testimony for the defendant's counterclaim to proceed beyond summary judgment. Accordingly, the court makes no finding as to the necessity of expert testimony in cases alleging mismanagement of workers' compensation claims.

ordered that the plaintiffs' unjust enrichment claim and account stated claim, which essentially

seek the same relief as the plaintiffs' breach of contract claim, will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge